Ronald MAYES, Plaintiff

v.

Richard J. ELROD, Individually and as Sheriff of Cook County, Winston E. Moore, Individually and as Executive Director of the Cook County Department of Corrections, Robert E. Glotz, John Brown, Richard English, Roland Johnson, the Cook County Department of Corrections, County of Cook, and the Cook County Board of Commissioners, Defendants.

No. 77 C 709.

United States District Court, N. D. Illinois, E. D.

May 18, 1979.

Martin J. Dubowsky, Marc S. Simon, Fohrman, Lurie, Holstein, Sklar & Cottle, Ltd., and David M. Schneider, Pritzker & Glass, Ltd., Chicago, Ill., for plaintiff.

Mitchell Ware, Chicago, Ill., for defendant Winston E. Moore.

Bernard Carey, State's Atty., Cook County, and John A. Dienner, III, Asst. State's Atty., Chicago, Ill., for all other defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 to recover damages for injuries he sustained when he was a state pretrial detainee at the Cook County Jail. The defendants named in the amended complaint are the Cook County Department of Corrections, its former executive director, three correctional officials in the Department, a jail guard, the Cook County Sheriff, Cook County itself, and the Cook County Board of Commissioners. Plaintiff alleges, in six counts, that defendants violated his constitutional rights under the due process clause of the Fifth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment by failing to provide him with adequate protection from attacks by other inmates and with humane living conditions during his confinement. Mayes claims that as a result of these violations, he was subjected to violent attacks and sexual assaults by other inmates, causing a combination of mental, psychological, emotional, and physiological suffering. He seeks compensatory and punitive damages as well as attorney's fees against all defendants.

The amended complaint contains a factual core which is incorporated into all six counts. Mayes was jailed as a pre-trial detainee on March 29, 1975, when he was unable to post bond on state robbery charges. From March 29 to July 14, 1975, he was held in Division I of the Cook County Department of Corrections. He was released at the end of that period after another person confessed to the crime.

Upon arrival at the jail, Mayes was not provided with soap, towels, sheets or a mattress. The jail was so overcrowded that he was forced to sleep in the common area or "dayroom" of the jail, which often offered only a cement floor or benches for repose. Sleep was difficult or impossible since the dayroom was the center of activity for the tier.

After three weeks, plaintiff received an offer to share a cell with another inmate. He declined, because he had been told by inmates that assaults and sexual attacks frequently occurred in the cells. However, seven weeks later, after enduring ten weeks of mental distress caused by the overcrowding and noise of the dayroom, plaintiff took the initiative and requested a cell with an inmate whom he thought was nonviolent. Another inmate, Ruben Johnson, threatened Mayes with bodily harm if he chose that cellmate, but offered Mayes a safe haven in his own cell. Mayes accepted Johnson's offer only after he received assurances from defendant Brown, a jail guard, that Johnson would not attack him.

In that cell, Johnson raped Mayes on two occasions and choked, beat and assaulted him on numerous other occasions. Plaintiff screamed loudly for help from the guards during these attacks, but none responded. He also filled out daily requests to see the warden, deputy warden, and a doctor when Johnson's threats began, telling them that his life was in danger. Defendants Moore and Glotz did not respond to these requests.

After these incidents with Johnson, plaintiff moved out of that cell to an undisclosed location, where he was again assaulted by other inmates and threatened with rape.

As a result of these incidents, plaintiff has suffered a permanent hearing loss, extreme mental distress, trauma, psychological and emotional damage, and embarrassment. In addition, plaintiff suffered due to the inhumane living conditions in the jail, including inadequate bedding materials, vermin and insect infestation, severe overcrowding, and inadequate food, lighting and ventilation.

Plaintiff's original complaint only sought relief against four correctional personnel, and named those persons only in their individual capacity. On August 5, 1977, we denied those defendants' motion to dismiss the complaint, holding that the complaint adequately invoked the Eighth Amendment's prohibition against cruel and unusual punishment by alleging that defendants were deliberately indifferent to plaintiff's need for protection from inmate attacks. *See Little v. Walker*, 552 F.2d 193 (7th Cir. 1977). On September 4, 1978, plaintiff filed an amended complaint which seeks to hold the original defendants liable in both their individual and official capacities, and which adds three county governmental bodies as defendants. These amendments are a response to the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in which it overruled prior precedent and held that local governing bodies and local officials could be sued directly and in their official capacities under § 1983 in certain situations.

Plaintiff's complaint against the three county governmental bodies—the Cook County Department of Corrections (the Department), the County of Cook (the County), and the Cook County Board of Commissioners (the Board)—is based on the following theories.

The Department is named in Counts II, III and IV, along with the county Sheriff and the Department's executive director. The Department has a statutory duty under Illinois law to house pre-trial detainees, and its executive director and the Sheriff have a duty to take proper care for the health and safety of pre-trial detainees. Ill.Rev.Stat., ch. 125, § 201 *et seq.* These defendants have persistently and customarily failed to provide pre-trial detainees with adequate protection against attacks and assaults between inmates, failed to properly screen, segregate and classify incoming inmates according to their propensity to commit assaultive acts, and failed to provide pre-trial detainees with humane living conditions. Defendants knew or should have known that these customs would result in a contin-

uing pattern of rapes and assaults between inmates. Their inaction in the face of this actual or constructive knowledge exhibits a "callous and reckless disregard" for plaintiff's safety and well-being. As a direct result of defendants' customs, plaintiff was raped, beaten and forced to live in an inhumane environment, thereby violating his rights to due process and to freedom from cruel and unusual punishment.

The County and the Board are named separately in Counts V and VI of the amended complaint. Here plaintiff alleges that the County and Board are local governmental units which have a statutory duty to provide adequate funding for the safe and proper operation of the Department. Ill.Rev.Stat., ch. 125, § 215 and ch. 34, §§ 302, 432. These defendants failed to provide such funding while plaintiff was housed at the jail, and that underfunding was part of a continuing pattern and custom in the county. As a result of this custom, the Cook County Jail was plagued by a host of dangerous and inhumane living conditions, including deficiencies in sleeping facilities, population density, ventilation, food, security, cell door locks, vermin and insect control, and inmate classification systems. As a direct result of these conditions, plaintiff was raped, beaten, and subjected to inhumane treatment. Plaintiff further alleges that these defendants' custom of inadequate funding "exhibited a callous and reckless disregard for plaintiff's safety."

The County, Board and Department have moved to dismiss the amended complaint, raising a variety of grounds. First, the Board and the Department lack capacity to be sued, since they are merely organizational subunits of the County and the Sheriff's office, respectively. Second, assuming the Board is suable, its members are entitled to absolute immunity because their decisions on budgetary allocations are akin to the actions of legislators involved in the presentation, debate and passage of laws. Third, the allegations against the County do not fall within the ambit of the *Monell* decision, because the challenged practice of withholding adequate funding of the jail is not a

"custom" and is too remote a link in the chain of causation leading to Mayes' injuries. Fourth, the budgetary decisions of the Board and the County involve the exercise of discretion in dividing up a fixed amount of revenues and are therefore beyond the scope of judicial review. The remainder of defendants' arguments rest on an interpretation or application of the *Monell* decision and are subsumed under that analysis.

■ The Board and the Department first contend that they are not suable entities, because they do not enjoy a separate legal existence independent of the County and the Sheriff's office. We agree.

■ The capacity of a governmental corporation to be sued in the federal courts is governed by the law of the state in which the district court is held. Rule 17(b), F.R. Civ.P.; 3A Moore's Fed.Pract. ¶ 17.19 at 17–199 (2d ed. 1978); 6 Wright & Miller, Fed.Pract. & Proc. ¶ 1562 at 738 (1971). An Illinois statute expressly provides that a county may be sued. Ill.Rev.Stat., ch. 34, § 301. Another statute impliedly authorizes suits against the sheriff by providing that the county shall indemnify the sheriff for any judgment recovered against him for his non-willful torts. *Id.,* § 301.1. However, we have found no statutory or case authority supporting a direct action against subdivisions of these entities, including the Board or the Department. Based on our appraisal of the statutory scheme which regulates these bodies, we infer that no such action was contemplated. The Department is "created within the office of the Sheriff," Ill.Rev.Stat., ch. 125, § 202, its powers and duties are exercised "under the direction of the Sheriff," *id.,* § 203, and its executive director "shall serve at the pleasure of the Sheriff." *Id.,* § 212. The Department therefore lacks any independent governmental footing.

Similarly, there is no need or purpose in naming the Board as a defendant in addition to the County. The Board's governmental authority is coextensive with that of the County, since it is authorized to exercise all the corporate powers of the County. Ill.Rev.Stat., ch. 34, § 302. In addition, the Board's institutional liability is automatically coextensive with that of the County, since it must direct the county treasurer to pay any judgment rendered against the County. *Id.,* § 604. Accordingly, the motion to dismiss the Board and the Department as separate defendants is granted. *See Dr. Martin Luther King, Jr. Movement v. City of Chicago,* 435 F.Supp. 1289, 1294 (N.D.Ill.1977); *Erie Human Relations Commission v. Tullio,* 493 F.2d 371, 376 (3d Cir. 1974); *Gates v. Council of City of Huntington,* 93 F.Supp. 757, 759 (D.W.Va.1950).

The County's arguments directed against plaintiff's *Monell* theory require analysis of two separate aspects of that opinion: the definition of a custom and the question of causation.

■ The first issue is whether the alleged continuing pattern of underfunding county programs can qualify as a "custom," as that term is defined in *Monell* and its precursors. In *Monell,* the Supreme Court stated that local governing bodies ". . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2036. The Court relied on *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), in which Justice Harlan defined a custom as a persistent practice of state officials which is so well settled that it has the same force of law as does a legislative pronouncement. He noted that official inaction can become so entrenched that it solidifies into a custom, but drew a distinction between two types of inaction. One type involves a neglect or refusal to enforce laws already on the books, or a systematic maladministration of those laws. The other involves a failure to take affirmative action to enact corrective legislation. Only the first type of inaction can qualify as a custom within the scope of § 1983. 398 U.S. at 167 n.39, 90 S.Ct. 1598; *see Ad Hoc Committee on Judicial Administration v. Commonwealth of Massachusetts,* 358 F.Supp. 953, 957 (D.Mass.), *aff'd,* 488 F.2d 1241 (1st Cir. 1973).

To apply this principle to the present case, we must first define what the existing Illinois law is, and then determine whether the allegations of the complaint arguably constitute a failure to fulfill it. The corporate powers of the County are exercised by the Board. Ill.Rev.Stat., ch. 34, § 302. The Board has a statutory duty "to erect or otherwise provide when necessary, and the finances of the county will justify it, and keep in repair, a suitable . . . jail . . . ." *Id.,* § 432. In addition, the Board "must appropriate and provide funds for the necessary[,] ordinary and contingent cost incurred by the office of the Sheriff in the performance of its powers, duties and functions under [the County Department of Corrections Act, Ill.Rev.Stat., ch. 125, §§ 201–215.]" *Id.,* § 215. Under that Act, the Department has a duty, *inter alia,* to operate the county jail, to have charge of all prisoners therein, to establish classification services and programs at the county jail "as may be appropriate," and to establish, "whenever feasible," separate detention and commitment facilities. *Id.* § 203. These statutes, when read together, create a discretionary duty to erect a jail in the first instance and mandatory duties on the County and the Board and the Sheriff and the Department to keep existing jails in repair and in suitable condition.

■ Failure to prevent the deplorable living conditions which are enumerated in paragraph 26 of Counts V and VI[1] constitute a violation of the mandatory duties. Persistent maladministration or non-enforcement of mandatory duties can provide the fodder for a claim of an official custom. Such failures when they occur with sufficient frequency, systematically deny citizens the full protection of existing law. We therefore conclude that plaintiff's complaint adequately alleges a custom within the scope of § 1983.

■ Although defendants also argue that the alleged practice of underfunding is not well-settled or persistent enough to be classified as a custom, the complaint makes that allegation, and it must be accepted as true on a motion to dismiss. The proper method to raise that argument is by a motion for summary judgment or at trial after plaintiff's proof has been presented. *See Lodermeier v. City of Sioux Falls,* 458 F.Supp. 1202, 1204–05 (D.S.D.1978).

■ The second prong of defendants' *Monell* argument is that the causal link between their alleged custom and plaintiff's alleged injury is too attenuated to state a claim for relief. In essence, plaintiff alleges that defendants' underfunding caused reduced security and overcrowding at the jail, and that environment spawned a climate of violence and unrest which ultimately provoked an inmate into assaulting plaintiff. In addition, plaintiff alleges that he suffered injuries as a result of the inhumane living conditions in the jail, which were caused by inadequate funding. In defendants' view, these allegations are insufficient because *Monell* only applies when a local governmental policy mechanically and unalterably causes a specific, identifiable and foreseeable injury to each member of a class of plaintiffs. In our opinion defendants read *Monell* too narrowly.

■ Section 1983 provides that any person who, under color of state law, "subjects, or causes to be subjected," any other person to the deprivation of any constitutional rights shall be liable for the resulting injuries. This language creates alternative methods for establishing the requisite causation for § 1983 liability. B is liable not only when B's own tort causes C to suffer a constitutional deprivation, but also when B causes A to commit a tort which subjects C to such a deprivation. *Monell, supra,* 436 U.S at 692, 98 S.Ct. 2018. Thus, § 1983 imposes liability on a governmental body

---

1. Those conditions were: "(A) Failure to provide adequate sleeping facilities; (B) Severe overcrowding; (C) Unsanitary and unhealthy living conditions; (D) Inadequate ventilation; (E) Inadequate and unhealthy food; (F) Inadequate security; (G) Improperly operating cell door locks; (H) Inadequate numbers of security personnel; (I) Inadequate vermin and insect control; (J) Inadequate inmate classification systems; and (K) Improper classification of assaultive inmates; and (L) Other inhumane conditions of Division I."

that, under the color of some official policy or custom, causes a person to violate plaintiff's constitutional rights. *Id.*

 Situations presenting this extended form of causation raise difficult analytical problems. The Supreme Court has provided four general guidelines. First, the causal link is lacking if "the sole nexus between the employer and the tort is the fact of the employer-employee relationship." 436 U.S., at 692–93, 98 S.Ct. at 2037. Consequently, concepts of vicarious liability and *respondeat superior* are inapplicable in § 1983 actions. Second, the causal link is also insufficient if it only involves a supervisor's failure to act in the face of unconstitutional actions by subordinates, at least when those actions are of insufficient regularity to form a pervasive pattern of violations. Without such a pattern, there is no basis for inferring that the supervisor implicitly authorized or approved such violations. *Rizzo v. Goode,* 423 U.S. 362, 371, 376, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Perry v. Elrod,* 436 F.Supp. 299, 303 (N.D. Ill.1977). *Rizzo* created some fear that official inaction would not support § 1983 liability. *See id.* at 384, 96 S.Ct. 598 (Blackmun, J., dissenting); *Smith v. Ambrogio,* 456 F.Supp. 1130, 1135 (D.Conn.1978). However, the Court's recent *Monell* decision suggests that *Rizzo* is limited to a holding that "the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell, supra,* 436 U.S at 694 n.58, 98 S.Ct. at 2037. This interpretation suggests that at least one form of inaction—failure to supervise combined with the exercise of some control—may be actionable. Third, the Court's decision in *Estelle v. Gamble,* 429 U.S 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which was decided after *Rizzo,* confirms that the Court did not rule out official inaction as a basis for § 1983 liability. In *Estelle,* the Court faced the question of what allegations could support a claim of medical mistreatment of prisoners under the Eighth Amendment.

Justice Marshall stated that "a prisoner must allege acts or *omissions* sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292 (emphasis added).[2] Finally, the Supreme Court has indicated that the causal link may be gauged by the tort principle that holds a person liable for the natural consequences of his actions. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled on other grds. in *Monell, supra.*

Lower courts have struggled to apply these principles to instances of constitutional misconduct involving governmental bodies and their senior personnel. They have concluded that a governmental body may be held liable for a pervasive pattern of constitutional abuses by its employees, if the entity's inaction or ineptitude in supervising those employees is so great that it evidences deliberate and conscious indifference to a substantial probability that constitutional violations will result. In such a case, the pattern of misconduct suggests the inference that the governmental body acquiesced in and implicitly authorized such violations. Alternatively, acceptance or support of general policies and practices within the governmental entity, implementation of which is alleged to have caused § 1983 violations, is sufficient to establish constructive knowledge of those violations and can substitute for proof that the entity acquiesced in the misconduct. *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978); *Smith v. Ambrogio,* 456 F.Supp. 1130, 1134–38 (D.Conn.1978); *Owens v. Haas,* 456 F.Supp. 1009, 1012 (E.D.N.Y.1978); *Norton v. McKeon,* 444 F.Supp. 384, 387–88 (E.D.Pa. 1977); *see also, Perry v. Elrod, supra; Santiago v. City of Philadelphia,* 435 F.Supp. 136, 151–53 (E.D.Pa.1977).

 We find that plaintiff's amended complaint falls within the scope of these standards for § 1983 liability. As to the Sheriff and the Department, there can be no question about the sufficiency of the causal connection between its alleged cus-

---

**2.** Therefore, an allegation of simple negligence is insufficient to constitute an Eighth Amend-

ment violation. *Little v. Walker,* 552 F.2d 193, 197 n.8 (7th Cir. 1977).

toms of providing inadequate inmate protection and inhumane living conditions and plaintiff's alleged Eighth Amendment deprivations, since the Sheriff and the Department have direct supervisory responsibility for the operation of the Cook County Jail. *See Smith v. Ambrogio, supra,* 456 F.Supp. at 1136. However, the County and the Board are one step removed from that connection. Their alleged acts or omissions only control the Department's financing, and that level of financing then affects the Department's ability to maintain adequate conditions at the jail. Nonetheless, we believe that in many instances responsibility for a constitutional violation is diffused through various levels of government and cannot be easily isolated at the particular level which operates most directly upon the victim. Identification of the primary or proximate cause of the injury is a factual question which cannot be resolved at this stage of the proceedings. It is enough at this point that plaintiff has charged the County with a continuing pattern of constitutional violations, a custom or policy which caused those violations, and a posture evidencing a "callous and reckless disregard for plaintiff's safety."

For its remaining argument, the County contends that its budgetary decisions concerning the jail involve the exercise of discretion in dividing up a fixed amount of revenues and are therefore beyond the scope of judicial review. However, the Seventh Circuit has stated that when federal courts are confronted with unconstitutional conditions in county jails, they may order governmental officials to take corrective actions which do not require unreasonable expenditures. *Duran v. Elrod,* 542 F.2d 998, 1000 (7th Cir. 1976). Although "the courts may not order a state public body to appropriate monies for prison reform," they may force state authorities to either "operate the jail constitutionally or not at all." *Jordan v. Wolke,* 593 F.2d 772, 775 (7th Cir. 1978). The issue of how scarce financial resources should be allocated is a factual question which must be aired at trial. *Duran, supra,* 542 F.2d at 1001.

For these reasons, the motion to dismiss the Board and the Department as separate defendants is granted and the motion to dismiss the County is denied. The County is ordered to answer the allegations of the amended complaint within twenty days.